ORIGINAL

AO 106 (Rev. 04/10)  Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>2015 Land Rover Range Rover Evoque,<br>white in color, with California license plate 7KBM387 | )<br>)<br>)<br>)<br>)<br>) |

Case No.  8:19-mj-00383

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-2

located in the _____ Central _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

FILED
CLERK, U.S. DISTRICT COURT

MAY 1 3 2019

CENTRAL DISTRICT OF CALIFORNIA
BY _____

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 841(a)(1), 846 | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ryan J. Stearman, Special Agent, ATF
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5-13-19

_____
*Judge's signature*

City and state:  Santa Ana, California

Hon. John D. Early, U.S. Magistrate Judge
*Printed name and title*

AUSA: S. Tenley x2829

## **AFFIDAVIT**

I, Ryan J. Stearman, being duly sworn, declare and state as follows:

## I.  **INTRODUCTION**

1.    I am currently assigned to the ATF Los Angeles Field Division, Santa Ana Field Office, and have been employed by the ATF since September 2005.  In the course of my employment as an ATF Special Agent, I have assisted in and conducted numerous investigations involving criminal street gangs, possession of firearms by prohibited persons, possession of stolen firearms, possession of machineguns, the illegal distribution of firearms, and burglaries and violent crime to include robberies.  In particular, I have conducted several serial robbery investigations involving a suspect or suspects committing numerous robberies, most of which were armed, of various businesses.  As an ATF Special Agent, I have also participated in numerous federal and state search and arrest warrants involving individuals engaged in conspiracies to commit robberies and burglaries, unlawfully trafficking firearms, unlawfully stealing firearms, unlawfully possessing firearms, as well as other criminal activity, including controlled substance offenses.  Additionally, I have participated in the collection and seizure of cellular telephone records, firearms records, and other types of evidence that documents activities in both the manufacturing and distribution of controlled substances.

2.    To successfully conduct these investigations, I have used a variety of investigative techniques and resources,

including physical and electronic surveillance, wire
interceptions, cellular telephone analysis, interviews, the
utilization of undercover agents and informants, and the review
of various databases and records.  I have also received training
during the course of my employment as an ATF Special Agent in
various topics to include but not limited to: robberies
affecting interstate commerce, illegal trafficking of firearms,
the utilization of informants, the activities of criminal street
gangs, asset forfeiture, and conducting surveillance and wire
interceptions.  Through these investigations, my training and
experience, and conversations with other experienced agents and
law enforcement personnel, I have become familiar with the
methods used by individuals to commit robberies; to smuggle,
safeguard, and store firearms; to distribute firearms; and to
collect and launder related, illicit proceeds.

## II. **PURPOSE OF AFFIDAVIT**

3.    This affidavit is made in support of an application
for a warrant to search (1) two iPhones seized from the person
of CHAD EVERETT STEWART ("STEWART"), (2) a Range Rover SUV
associated with one of STEWART's residences, and (3) a padlocked
storage locker in the garage of the resident's parking lot
associated with that same residence, all in connection with an
investigation into STEWART for controlled substance violations.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  <u>DIGITAL DEVICES TO BE SEARCHED</u>

5.    The digital devices to be searched are as follows:

a.    Black Samsung Galaxy J2 smartphone, with IMEI 352475103924435, seized from the person of STEWART on May 13, 2019 ("SUBJECT DEVICE 1"); and

b.    Black Apple iPhone, model A1660, with IMEI 355311088165685, seized from the person of STEWART on May 13, 2019 ("SUBJECT DEVICE 2," and together with SUBJECT DEVICE 1, the "SUBJECT DEVICES").

The SUBJECT DEVICES are currently in the custody of ATF, and are further described in Attachment A-1, which is incorporated fully herein by reference.

### IV.  <u>VEHICLE TO BE SEARCHED</u>

6.    The vehicle to be searched is described as a 2015 Land Rover Range Rover Evoque, white in color, with California license plate 7KBM387 (the "SUBJECT VEHICLE"), as further described in Attachment A-2, which is incorporated fully herein by reference.

### V.  <u>STORAGE UNIT TO BE SEARCHED</u>

7.    A storage locker within the residential parking area to the apartment complex located at 11893 South Truro Avenue,

Hawthorne, California 90250 ("SUBJECT STORAGE UNIT"), as further
described in Attachment A-3, which is incorporated fully herein.

## VI. **STATEMENT OF PROBABLE CAUSE**

### A.   **Background**

8.   On May 10, 2019, the Honorable Autumn D. Spaeth,
United States Magistrate Judge, issued warrants authorizing the
search of two residences and one vehicle associated with STEWART
for evidence, fruits, and instrumentalities of violations of 21
U.S.C. §§ 841(a)(1) (distribution and possession with intent to
distribute controlled substances) and 846 (conspiracy to
distribute and possess with intent to distribute controlled
substances).  A true and correct copy of application and
affidavit of ATF SA Michael A. Fernald ("Fernald Affidavit")
submitted in connection with those warrants is attached hereto
as Exhibit 1, and incorporated fully herein by reference.[1]

9.   As set forth in the Fernald Affidavit, STEWART is
suspected of supplying cocaine and heroin, among other
controlled substances, to individuals associated with the
Imperial Gangsta Bloods, who then distribute those controlled
substances throughout Northern Virginia and the surrounding
area.

10.  Specifically, no less than four cooperating defendants
have provided information describing how STEWART mailed
controlled substances (including cocaine and heroin) from the
Central District of California to Northern Virginia via USPS,

_____

[1] All three warrants relied upon the same affidavit from SA
Fernald.

UPS, and Federal Express.  (See Fernald Affidavit at ¶¶ 23-44.)
Those witness statements are corroborated by, among other
information, text messages sent or received by STEWART regarding
shipments, drug amounts, and pricing.  (Id. at ¶¶ 16(a), 20.)

**B.   Arrest of STEWART and Seizure of SUBJECT DEVICES**

11.   Based on information received from SA Fernald, I
learned the following:

a.   On May 13, 2019, just before 9:10 a.m., SA
Averill entered the secured parking garage where STEWART's Jeep
Grand Cherokee (the "Jeep") was parked.[2]  While sitting inside of
his unmarked vehicle, SA Averill observed STEWART exit the
elevator to the parking garage and enter the Jeep.
Approximately one minute later, STEWART got out of the Jeep and
approached SA Averill's vehicle.  Because STEWART appeared to
have determined that he was under surveillance by law
enforcement, SA Averill took STEWART into custody pursuant to a
federal arrest warrant out of the Eastern District of Virginia.

b.   SA Fernald and SA Sanders assisted SA Averill in
taking STEWART into custody.  While searching STEWART's person
incident to arrest, SA Fernald and SA Sanders recovered two
cellular telephones: (1) a Black Samsung Galaxy J2 smartphone,
with IMEI 352475103924435 (SUBJECT DEVICE 1), and (2) a Black
Apple iPhone, model A1660, with IMEI 355311088165685 (SUBJECT
DEVICE 2).  SUBJECT DEVICE 1 and SUBJECT DEVICE 2 were taken
into ATF custody as potential evidence.

---

[2] One of the warrants authorized by Judge Spaeth pertained
to the Jeep Grand Cherokee.

12.   Based on my training and experience, I know that
individuals typically maintain their cellular telephones on
their person, including when traveling.  Based on my training
and experience, I know that individuals involved in criminal
activities will often communicate with their associates before,
during, or after the crime by using cellular telephones and that
communication can be made through either verbal conversation,
text messages, or third party communication applications.

13.   Based on my training and experience, I also know that
information gained through the obtaining of data stored in
cellular telephones and other devices such as address books or
contact files in an individual's cellular telephone and other
devices, as well as the recovery of messages sent or received
from that cellular telephone and other devices, and through
review of photographs and videos, can lead to identifying
accomplices, or witnesses to the crimes committed by the
individual.  Individuals also use their cellular devices to set
up, track, and coordinate the shipping of packages through
various companies.

C.     **The SUBJECT VEHICLE**

14.   Based on information received from SA Fernald, I
learned the following:

a.   On the afternoon of May 13, 2019, SA Fernald and
other law enforcement agents executed the search warrant for
11893 South Truro Avenue, No. 3, Hawthorne, California 90250
("SUBJECT PREMISES 1"), a suspected residence of STEWART.  Facts

related to STEWART's associated with SUBJECT PREMISES 1 are set forth in paragraphs 51 through 57 of the Fernald Affidavit.

       b.   When agents entered SUBJECT PREMISES 1, Ranger Rover keys were found on the kitchen island.  Inside of the resident's parking lot, agents located the SUBJECT VEHICLE, a white Land Rover Range Rover Evoque.

       c.   Agents observed through the window of the SUBJECT VEHICLE a note on the passenger seat that stated, "Apt #5 Kadie check my door."  Based on his review of law enforcement databases, SA Fernald knows that Apartment Number 5 within the same complex as SUBJECT PREMISES 1 is associated with Jamar Stewart, CHAD EVERETT STEWART's brother.

       d.   I also learned that within SUBJECT PREMISES 1 agents observed packaging materials, including books with carved out spaces likely used for distributing controlled substances. (See Fernald Affidavit ¶ 27.)

15.  Based on my training and experience, I know that distributors of controlled substances will utilize vehicles to move, store and conceal their controlled substances and proceeds from law enforcement and the theft of others.  These vehicles may have "traps" or other concealment methods within the vehicle or attached to the vehicle.  These vehicles may also store receipts and records from the shipping of controlled substances or receipt for packages of currency.

**D.   The SUBJECT STORAGE UNIT**

16.  Based on information received from SA Fernald, I learned that during the search of SUBJECT PREMISES 1, agents

located a "UHaul" lock key.  That key fit a padlock to a storage

unit (the SUBJECT STORATE UNIT) within the parking structure

associated with the apartment complex for SUBJECT PREMISES 1.

17.  Based on my review of photographs of the SUBJECT

STORAGE UNIT, I know that it is brown in color, with two double

doors.  The pad lock is gold in color.  At the time of the

photograph, a white Toyota Corolla and a yellow sedan were

parked in front of the unit.  The storage unit appears to be

between areas marked with the numbers "10" and "9."

18.  Based on my training and experience, I know that

distributors of controlled substances will utilize storage units

and other lockers to store and conceal items used for the

distribution of controlled substances such as boxes and bags.

Individuals may also maintain in storage units records related

to the distribution of controlled substances.

**VII.  TRAINING AND EXPERIENCE REGARDING DIGITAL DEVICES**

19.  Based on my training, experience, and information from

those involved in the forensic examination of digital devices, I

know that the following electronic evidence, inter alia, is

often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or

remnants of such files months or even years after the files have

been downloaded, deleted, or viewed via the Internet.  Normally,

when a person deletes a file on a computer, the data contained

in the file does not disappear; rather, the data remain on the

hard drive until overwritten by new data, which may only occur

after a long period of time.  Similarly, files viewed on the

Internet are often automatically downloaded into a temporary

directory or cache that are only overwritten as they are

replaced with more recently downloaded or viewed content and may

also be recoverable months or years later.

b.   Digital devices often contain electronic evidence

related to a crime, the device's user, or the existence of

evidence in other locations, such as, how the device has been

used, what it has been used for, who has used it, and who has

been responsible for creating or maintaining records, documents,

programs, applications, and materials on the device.  That

evidence is often stored in logs and other artifacts that are

not kept in places where the user stores files, and in places

where the user may be unaware of them.  For example, recoverable

data can include evidence of deleted or edited files; recently

used tasks and processes; online nicknames and passwords in the

form of configuration data stored by browser, e-mail, and chat

programs; attachment of other devices; times the device was in

use; and file creation dates and sequence.

c.   The absence of data on a digital device may be

evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the

device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal

data by using encryption, steganography, or by using misleading

filenames and extensions.  Digital devices may also contain

"booby traps" that destroy or alter data if certain procedures

9

are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

20.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

21.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress STEWART's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of STEWART's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

22.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.      ITEMS TO BE SEIZED

23.   Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846 (conspiracy to distribute controlled substances, and distribution and possession with intent to distribute controlled substances), will be found upon the search of the SUBJECT DEVICES, the SUBJECT VEHICLE, and the SUBJECT STORAGE UNIT.

## IX. CONCLUSION

24.   For all the reasons described above, there is probable cause to believe that evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846 (conspiracy to distribute controlled substances, and distribution and possession with intent to distribute controlled substances), as described above and in Attachment B of this affidavit, will be found upon the search of

//

//

the SUBJECT DEVICES, the SUBJECT VEHICLE, and the SUBJECT
STORAGE UNIT.

_____
Ryan J. Stearman, Special
Agent, ATF

Subscribed to and sworn before me
this _13th_ day of May, 2019.

_____
HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE

13

## **ATTACHMENT A-2**

<u>VEHICLE TO BE SEARCHED</u>

    2015 Land Rover Range Rover Evoque, white in color, with California license plate 7KBM387.

**ATTACHMENT B**

ITEMS TO BE SEIZED

    1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and/or 846 (distribution and possession with intent to distribute controlled substances, and conspiracy to distribute controlled substances) (the "Subject Offenses"), namely:

        a.   Controlled substances, packaging materials, indicia of distribution, records and documents, receipts, notes ledgers and other papers including any computerized or electronic records including cellular telephones, relating to the ordering, purchase or possession of controlled substances;

        b.   U.S. currency and other illicit gains from the distribution of controlled substances;

        c.   Address and/or telephone books and papers, including computerized or electronic address and/or telephone records reflecting names, addresses and/or telephone numbers;

        d.   Books, records, receipts, bank statements, and records, money drafts, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money or other assets including, but not limited to, controlled substances;

        e.   Documents and papers evidencing ownership of proceeds from the sale of controlled substances, storage and location of such assets and facilities to safely store and

iv

secure such items, such as safes, to include lock boxes, and strong boxes;

   f. Photographs, in particular, photographs of controlled substances and photographs of individuals possessing controlled substances and photographs showing the association of individuals;

   g. Indicia of occupancy, residence, and/or ownership of the premises described herein, including, but not limited to, utility and telephone bills, cancelled envelopes, and keys;

   h. Cellular phones, computers, and other electronic storage media or digital devices.  Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

   i. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

    i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security
software designed to detect malicious software;

       iii. evidence of the attachment of other devices;

       iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

       v.   evidence of the times the device was used;

       vi.  passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

       vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

       viii.    records of or information about
Internet Protocol addresses used by the device;

       ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.    As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.    <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

4.    In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

   b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

      i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

      ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

      iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

   c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime

was encountered, including how it was immediately apparent contraband or evidence of a crime.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order
of the Court.

5.    In order to search for data capable of being read or
interpreted by a digital device, law enforcement personnel are
authorized to seize the following items:

a.    Any digital device capable of being used to
commit, further, or store evidence of the offense(s) listed
above;

b.    Any equipment used to facilitate the
transmission, creation, display, encoding, or storage of digital
data;

c.    Any magnetic, electronic, or optical storage
device capable of storing digital data;

d.    Any documentation, operating logs, or reference
manuals regarding the operation of the digital device or
software used in the digital device;

e.    Any applications, utility programs, compilers,
interpreters, or other software used to facilitate direct or
indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles,
or similar physical items that are necessary to gain access to
the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys,
test keys, encryption codes, or other information necessary to
access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, law
enforcement is permitted to: (1) depress STEWART's thumb and/or

x

fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of STEWART's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

Exhibit 1

AO 106 (Rev. 04/10)  Application for a Search Warrant (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No.  8:19-MJ-00372 |
| 2018 Jeep Grand Cherokee, black in color, | ) | |
| bearing California license plate 8EDR110, | ) | |
| with Vehicle Identification Number 1C4RJFCG5JC436617 | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3

located in the _____ Central _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 846 | See attached Affidavit |

The application is based on these facts:

See attached Affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/
*Applicant's signature*

Michael A. Fernald, Special Agent, ATF
*Printed name and title*

Sworn to telephonically by permission.

Date: ___5/10/19___

/s/ Autumn D. Spaeth
*Judge's signature*

City and state:  Santa Ana, California

Hon. Autumn D. Spaeth, U.S. Magistrate Judge
*Printed name and title*

AUSA: S. Tenley x32829

**AFFIDAVIT**

I, Michael A. Fernald, being duly sworn, declare and state
as follows:

## I.  INTRODUCTION

1.  I am a Special Agent ("SA") with the Bureau of
Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been
so employed since 2014.  Prior to my appointment with the ATF, I
was a sworn law enforcement officer in the Commonwealth of
Virginia for over eleven years.  I am currently assigned to the
ATF Falls Church Group II Field Office in Virginia, an
enforcement group, responsible for investigating violent crime,
gangs, armed drug trafficking, and other firearm related
violations.  In my capacity as a law enforcement officer, I have
investigated individuals for the illegal possession and use of
firearms, illegal possession and distribution of controlled
substances, and for committing violent crimes.  Many of these
investigations involved the execution of search warrants, and
led to the arrest and conviction of individuals for violations
of state and federal laws.

2.  During my time as a law enforcement officer, I have
become knowledgeable of the methods and modes of narcotics
operations, and the language and patterns of drug abuse and
trafficking.  I have gained knowledge in the use of various
investigative techniques including the use of wiretaps, physical
surveillance, undercover agents, confidential informants and
cooperating witnesses, the controlled purchases of illegal
narcotics, electronic surveillance, consensually monitored

recordings, investigative interviews, financial investigations, the service of Grand Jury Subpoenas, and the execution of search and arrest warrants.

## II. PURPOSE OF AFFIDAVIT

3.    This affidavit is made in support of an application for warrants to search (1) an apartment in Hawthorne, California, (2) an apartment in Anaheim, California, and (3) a 2018 Jeep Grand Cherokee, all of which are associated with CHAD EVERETT STEWART ("STEWART"), an individual suspected of engaging in the cross-country distribution of controlled substances.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.   This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.   Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## III. PREMISES TO BE SEARCHED

5.    The premises to be searched are:

a.    The residence located at 11893 South Truro Avenue, No. 3, Hawthorne, California 90250 ("SUBJECT PREMISES 1"), as more fully described in Attachment A-1;

b.    The residence located at 2100 East Katella Avenue, No. 244, Anaheim, California 92806 ("SUBJECT PREMISES 2"), as more fully described in Attachment A-2; and

2

c.    A 2018 Jeep Grand Cherokee, bearing California
license plate 8EDR110, with VIN 1C4RJFCG5JC436617 (the "SUBJECT
VEHICLE"), as more fully described in Attachment A-3.
Attachments A-1, A-2, and A-3 are incorporated fully herein by
reference.

### IV. SUMMARY OF PROBABLE CAUSE

6.    The ATF, Federal Bureau of Investigation ("FBI"),
Virginia State Police, and other law enforcement agencies are
investigating drug trafficking activity in the Northern Virginia
area by members of the Imperial Gangsta Bloods and others.
Based on information that arose out of a December 2017 takedown
operation – including statements from cooperating defendants
arrested or charged in connection with the investigation and
text messages seized from digital devices – law enforcement
agents identified CHAD EVERETT STEWART, a resident of the
Central District of California, as the individual supplying
controlled substances to the drug trafficking organization under
investigation.

7.    Specifically, no less than four cooperating defendants
have provided information describing how STEWART mailed
controlled substances (including cocaine and heroin) from the
Central District of California to Northern Virginia via USPS,
UPS, and Federal Express.  Those witness statements are
corroborated by, among other information, text messages sent or
received by STEWART regarding shipments, drug amounts, and
pricing.

3

8.   While the cooperating defendants largely ceased communications with STEWART at the time of the takedown, the investigation has further determined that STEWART is actively engaged in the drug trade.  In connection with a February 2019 controlled delivery of cocaine in Northern Virginia, law enforcement was able to view text messages on a cellular telephone belonging to the individual who introduced STEWART to a representative of the Imperial Gangsta Bloods': KENDALL HENRY. Text messages indicated that KENDALL HENRY and his mother were actively involved in drug distribution activity with STEWART. Toll records also establish that in April 2019, STEWART was in contact with KENNETH HENRY (KENDALL HENRY's father), also a known drug trafficker.  Finally, as recently as May 9, 2019, STEWART's telephone was in communication with other telephone numbers also in contact with KENDALL HENRY and his mother, causing agents to believe the user of the telephone numbers are also engaged in drug trafficking activity with STEWART, KENDALL HENRY, and KENDALL HENRY's mother.

9.   GPS data associated with STEWART's telephone shows that STEWART's telephone is frequently at SUBJECT PREMISES 1 and SUBJECT PREMISE 2.  STEWART has been observed by agents at the rear of the apartment building that includes SUBJECT PREMISES 1. The SUBJECT VEHICLE is registered in STEWART's name, with an address of SUBJECT PREMISES 2.  Public records databases, including records related to utilities, associates STEWART with both SUBJECT PREMISES 1 and SUBJECT PREMISES 2.

## V.  **STATEMENT OF PROBABLE CAUSE**

10.  I am the lead ATF agent assigned to Operation Tin Panda, an investigation into drug trafficking activity in Northern Virginia.  During the course of the investigation, I have participated in controlled purchases; obtained and executed search warrants for social media, residences, electronics to include phones, and location data; interviewed cooperating defendants; reviewed law enforcement reports prepared during the investigation; discussed the investigation with various other law enforcement agents assigned to it; and conducted surveillance, among other activities.  Unless otherwise specified below, the facts set forth in this affidavit are based on information learned during those investigative activities.

### A.  **Background to Operation Tin Panda**

11.  In March 2017, the ATF and FBI began jointly investigating the Imperial Gangsta Bloods ("IGB") and others within the Northern Virginia area and elsewhere, an investigation dubbed Operation Tin Panda.  IGB members were known by law enforcement to be involved in narcotics distribution, firearms trafficking, home invasions, robberies, assaults, and homicides in Virginia, the District of Columbia, and Maryland.

12.  Through the course of this investigation, which is ongoing, law enforcement identified the individual within IGB who obtained controlled substances for the gang: Cooperating Defendant 2 ("CD-2").  CD-2 supplied Cooperating Defendant 1 ("CD-1"), a high-ranking member of the IGB, with cocaine and

heroin.  CD-1 then provided it to other IGB gang members for
further distribution.  Beginning on December 5, 2017 and beyond,
CD-1, CD-2, and others were arrested for their involvement in
this conspiracy.

**B.**   **December 6, 2017 Takedown**

13.  On December 6, 2017, over 300 law enforcement agents
and officers executed a coordinated takedown as part of
Operation Tin Panda.  That day, law enforcement arrested 30
individuals and searched 14 residences.  I participated in the
takedown effort and was the lead ATF agent involved in the
operation.  The information set forth below is based on my
personal participation in the takedown, my conversations with
other agents involved in the takedown, my review of reports and
other information generated as a result of the takedown, and my
review of evidence obtained during the takedown.

1.   Search at 12905 Kerrydale Road, Woodbridge,
     Virginia

14.  On December 6, 2017, law enforcement executed a
federal search warrant at 12905 Kerrydale Road, Woodbridge,
Virginia.  At that time, this address was the primary residence
of MAURICE JOHNSON, an individual suspected of participating in
IGB's drug trafficking activity.  JOHNSON was present at the
location when the search warrant was executed.  Law enforcement
located and seized four firearms, ammunition, and six cellular
phones from the inside of the residence.

15.  Agents recovered an Alcatel cell phone during the
search.  Two of the contact telephone numbers in the Alcatel

cell phone featured Los Angeles-area area codes.  The phone number (818) 310-6903 was stored under the name "FAM" (hereinafter "STEWART Tel. Number 1") and the phone number (323) 338-9173 was stored under the name "CAL" (hereinafter "STEWART Tel. Number 2").

a.   CD-2 later told investigators that CD-2, CD-3, and JOHNSON referred to STEWART as "CAL" or "FAM."

16.   The Alcatel phone also contained text message conversations between JOHNSON and STEWART Tel. Numbers 1 and 2 that are consistent with drug trafficking activity.  ATF SA Zachary Mikkelson reviewed and transcribed the text messages below.

a.   Based on my training and experience, I interpret the following text message exchange as discussing payment for controlled substances:

July 24, 2017 and July 25, 2017

| | |
|---|---|
| STEWART Tel. Number 2: | Hit me |
| STEWART Tel. Number 2: | It's short 500 |
| JOHNSON: | What was it |
| STEWART Tel. Number 2: | 29800 |
| JOHNSON: | K |

May 21, 2017 - May 22, 2017

| | |
|---|---|
| STEWART Tel. Number 1: | He said these people new but the price going to change |
| STEWART Tel. Number 1: | The most he can do is 500 on the next go round |
| JOHNSON: | When r they ready |

```
STEWART Tel. Number 1:    When ever you are

JOHNSON:                  So they on deck

STEWART Tel. Number 1:    Yeah with that one you got

JOHNSON:                  Yea u got 2 for me right

STEWART Tel. Number 1:    I didn't get that yet in my
                          hands

JOHNSON                   Ok I'll call n 30

STEWART Tel. Number 1:    Ok cool

JOHNSON:                  Can't call I'll call n the am
                          if possible get up to 2 of
                          them tomorrow for me

STEWART Tel. Number 1:    Not there yet

STEWART Tel. Number 1:    GOT TO BE TOMORROW

JOHNSON:                  K
```

    b.    Based on my training and experience, I interpret
other text messages to be about the distribution of controlled
substances:

<u>January 9, 2017 - January 10, 2017</u>

```
STEWART Tel. Number 1:    Ok waiting on the rest

JOHNSON:                  U have all our or no

STEWART Tel. Number 1:    Nah still one tied up on your
                          end

JOHNSON:                  Can u move with what u have

STEWART Tel. Number 1:    My people's coming to see me
                          I should be able

JOHNSON:                  Yea that's the plan I'll fix
                          it if short out ASAP if u can
```

```
STEWART Tel. Number 1:    I don't know if it's short
                          haven't got the other math
                          yet

JOHNSON:                  No with what you have now

STEWART Tel. Number 1:    I'm checking this as we speak

STEWART Tel. Number 1:    Waiting on them now but we
                          should be good.

JOHNSON:                  K

JOHNSON:                  I'll hit u n the am
```

c.   Based on my training and experience, I interpreted other text messages as containing a series of numbers consistent with tracking numbers for shipments back and forth.  For example:

December 15, 2016

```
JOHNSON:                  3458 macbain CT triangle VA
                          22172

STEWART Tel. Number 1:    It won't be today fam.

JOHNSON                   Don't use that as then

JOHNSON:                  Ad

STEWART Tel. Number 1:    Ok cool

STEWART Tel. Number 1:    Give me a minute I'll call
                          you
```

December 16, 2016

```
JOHNSON:                  14452 filerate St woodbridge
                          22193

STEWART Tel. Number 1:    Ok cool
```

December 17, 2016

    STEWART Tel. Number 1:   9405809699939522372849

    JOHNSON:                 K

December 19, 2016

    STEWART Tel. Number 1:   What's good

    JOHNSON:                 U what's up

    STEWART Tel. Number 1:   Everything good

    JOHNSON:                 TD thanks

    STEWART Tel. Number 1:   Cool

17.  Law enforcement also recovered a Samsung Galaxy S4 cellular telephone during the search.  The telephone number associated with the Samsung Galaxy phone was previously identified by law enforcement as belonging to another cooperating defendant ("CD-3").  The contact list on Samsung phone contained an entry for STEWART Tel. Number 2 under the name "CALF."

    2.  Search at 13715 Lynn Street, Woodbridge, Virginia

18.  Also on December 6, 2017, law enforcement executed a federal search warrant at 13715 Lynn Street, Woodbridge, Virginia.  This residence was leased by a friend of CD-2 and was utilized by CD-2 to store his controlled substances, including cocaine and heroin, over the course of the conspiracy.  During this search, law enforcement recovered approximately 1,014 grams of heroin.  In addition to the heroin, law enforcement seized a "big bastard" kilogram press, a smaller press, two digital scales, suspected cutting material, and a food saver sealer and

food saver bags.  CD-2 later admitted that STEWART had sent him
the heroin seized during the execution of the search warrant.

### 3.   Search at 15144 Cloverdale Road, Woodbridge, Virginia

19.  Law enforcement also executed a federal search warrant
at CD-2's primary residence, 15144 Cloverdale Road, Woodbridge,
Virginia, while simultaneously arresting CD-2 pursuant to a
federal warrant.  After arresting CD-2, law enforcement seized
one firearm, assorted ammunition, 9 cellular phones, $12,580 in
U.S. currency, an electronic money counter, and legal paperwork
in CD-2's name.  One of the cell phones recovered was an Apple
iPhone.  The phone number associated with that iPhone was known
by law enforcement to be associated with CD-2.

20.  Information stored within this iPhone showed that CD-2
used the phone to communicate with STEWART Tel. Number 2, CD-3,
and JOHNSON regarding drug distribution related activity.  For
example, on November 29, 2017, CD-2 sent CD-3 a text message
stating, "fam said call him," "It's there."  As discussed above,
"Fam" is a moniker for STEWART.

### 4.   Search at 2750 Green Ash Loop, Apartment #404, Woodbridge, Virginia

21.  Finally, law enforcement executed a federal search
warrant at 2750 Green Ash Loop, Apartment #404, Woodbridge,
Virginal, the primary residence of Cooperating Defendant 4 ("CD-
4") and a location that CD-2 regularly visited.  Within this
location, law enforcement recovered one firearm, several hundred
rounds of ammunition, 12 cellular phones, 3 digital scales, two
200mg calibrating weights, a food saver vacuum bag sealing

device, packaging materials, 5.5 grams of cocaine, approximately 96 grams of THC edibles, and approximately $20,000 in U.S. currency.

22.   Law enforcement also forensically analyzed an Apple laptop computer seized at this residence.  Data located on the computer revealed that the user visited websites used to track packages through FedEx and/or the USPS at least 99 times.  The Google Chrome user profile identified CD-4 as the user.

**C.   Information from CD-2[1]**

23.   On May 1, 2018, law enforcement interviewed CD-2.[2] During the interview, CD-2 revealed that he, CD-3, and JOHNSON had been distributing multi-kilogram quantities of cocaine on a monthly basis since 2016.  CD-2 had also recently began receiving kilograms of heroin.  CD-2 stated the STEWART was the source of supply for both the cocaine and heroin.

24.   CD-2 explained that he was introduced to STEWART in early 2015 by KENDALL HENRY.[3]  Both KENDALL HENRY, and his father, KENNETH HENRY (known as "Bamboo"), know STEWART.[4]  CD-2

---

[1] During the course of the investigation, I was present for nearly every interview and debrief with a cooperating defendant. To the extent I was not present, I discussed the interviews with agents who were present and reviewed the associated reports.

[2] CD-2 was a six-time convicted felon, not including federal drug trafficking convictions for his involvement in this conspiracy.  We determined that information provided by CD-2 was credible and corroborated by other investigative information. CD-2 is providing information to law enforcement in the hope of receiving sentencing consideration.

[3] CD-2 met KENDALL HENRY and KENNETH HENRY through JOHNSON.

[4] As discussed below, the investigation has determined that KENDALL HENRY, KENNETH HENRY, and KENDALL HENRY's mother are engaged in ongoing drug trafficking activity with STEWART.

told KENDALL HENRY that he was looking for a source for drugs and for that reason, KENDALL HENRY introduced him to STEWART. CD-2 said he had visited STEWART in California on at least three occasions, and STEWART has visited CD-2 in Virginia on at least one occasion.

25.   Law enforcement showed CD-2 a photograph of STEWART, and CD-2 confirmed him as the group's source of supply and who he referred to as "CAL" or "FAM." CD-2 identified phone numbers within his own phone that he used to communicate with STEWART regarding drug trafficking. CD-2 identified STEWART Tel. Number 2 and an additional number, 310-956-2734 (hereafter "STEWART Tel. Number 3"), as such numbers. Both phone numbers have Los Angeles-area codes, which is a known hub for cocaine distribution within the United States because of its close proximity to cocaine production areas outside of the country.

26.   CD-2 stated that when he visited STEWART, he flew into Los Angeles.[5] CD-2 stated STEWART lived approximately 15-20 minutes away from the airport, on Truro Avenue. CD-2's phone contained the address 11888 Truro Avenue, Hawthorne, CA 90250 (across the street from SUBJECT PREMISES 1), and CD-2 confirmed this is the area where STEWART lives.

27.   According to CD-2, he started out purchasing large quantities of marijuana from STEWART before moving on to cocaine to achieve higher profit levels. CD-2 stated that when he first began buying cocaine in early 2015, he purchased approximately 3

_____

[5] Law enforcement subsequently obtained flight information that corroborated information from CD-2 and others about air travel conducted in connection with the conspiracy.

to 5 kilograms of cocaine before breaking contact with STEWART for approximately five months to work with a cheaper source of supply.  Around the summer of 2015, CD-2 reinitiated contact with STEWART and resumed purchasing controlled substances from him at the rate of two kilograms at a time, working up to the rate of 5 kilograms at a time.  CD-2 reported he would receive each kilogram of cocaine purchased individually and would come inside of a book with a compartment cut into it.  STEWART would ship the cocaine via USPS, FedEx, and UPS.

28.   In approximately late 2015, CD-2 introduced JOHNSON and CD-3 to STEWART.  They then began pooling their cash and jointly purchased large quantities of marijuana from STEWART. In 2016, the partners began jointly purchasing cocaine from STEWART instead.  The co-conspirators pooled their money together in bulk shipments of U.S. currency to STEWART, and in return, STEWART sent bulk shipments of cocaine to designated addresses in the Northern Virginia area.  CD-2 stated that STEWART required his customers to order at least 5 kilograms of cocaine per month.  CD-2 maintained this purchasing level, and CD-3 and JOHNSON together also maintained this level of purchasing and distribution.

29.   CD-2 reported the group communicated with STEWART via cellular phones, to include phone calls, FaceTime video calls, and text messages to order product and coordinate shipments of U.S. currency and controlled substances.

30.   CD-2 stated that STEWART charged $25,000 per kilogram of cocaine if paid up front, and $32,000 if purchased on consignment.

31.   CD-2 provided his cash to JOHNSON and/or CD-3.  CD-2, CD-3, and JOHNSON would then combine their cash and mail it to the Los Angeles area, where STEWART was located.  JOHNSON provided cash to invest in the business but tried to "keep his hands clean" and stay out of the overt drug activity.  CD-3, on the other hand, served as the primary point of contact with STEWART, arranging outgoing shipments of cash and incoming shipments of product through family members and other parties.

32.   CD-2 received packages in the mail from STEWART that contained individual kilograms concealed within a cut out portion of a large book.  CD-2 explained that regardless of the quantity of kilograms he ordered, they would arrive one kilogram at a time, individually packaged in a book, through the USPS. CD-2's average profit was approximately $15,000 per kilogram.

33.   On one occasion, CD-4 flew to Los Angeles with $40,000 in U.S. currency to provide to CD-2 for the purchase of kilograms of cocaine from STEWART in California.

**D.   Information from CD-1**

34.   On July 9, 2018, law enforcement interviewed CD-1.[6] Law enforcement agents learned that CD-1 regularly purchased,

---

[6] CD-1 has pleaded guilty to federal firearm and drug trafficking charges for his involvement in this conspiracy.  CD-1 has no prior felony charges, but has a misdemeanor domestic violence conviction.  CD-1 has admitted to directing another gang member to carry out a homicide on behalf of the gang.  We

and arranged third party purchases of, large amounts of cocaine and heroin from CD-2 for approximately nine months prior to the takedown on December 6, 2017.

39.   CD-1 said that CD-2 was supplied with cocaine, marijuana, and heroin from an individual CD-2 met in California. CD-1 also met this supplier.   In 2016, CD-2 asked CD-1 to travel to California and deliver $30,000 to CD-2's source of supply. CD-1 flew to California and met the individual at the airport. Law enforcement showed CD-1 a photograph of STEWART, and CD-1 positively identified STEWART as the individual to whom he delivered $30,000 on behalf of CD-2.

### E.   Information from CD-3

35.   Law enforcement also interviewed CD-3, an individual involved in the activity of receiving controlled substances shipped to Northern Virginia.[7]   At the time of his arrest on September 20, 2018, CD-3 waived his Miranda rights and spoke to law enforcement.   His statements confirmed much of what CD-2 told law enforcement.

36.   CD-3 estimated he started distributing cocaine with CD-2 and JOHNSON in November 2016.   CD-3's role in late 2016 was

---

determined that information provided by CD-1 was credible and corroborated by other investigative information.   CD-1 is providing information to law enforcement in the hope of receiving sentencing consideration in his pending federal case.

[7] CD-3 has a previous federal conviction for conspiracy to distribute cocaine base in Northern Virginia.   CD-3 has also been convicted for his involvement in this conspiracy.   I am not aware of any other felony convictions or convictions for crimes involving dishonesty.   We determined that information provided by CD-3 was credible and corroborated by other investigative information.   CD-3 is providing information to law enforcement in the hope of receiving sentencing consideration in his pending federal case.

coordinating the shipment and receipt of packages through family members, their friends, and homes on the rental market or for sale.  Those involved in picking up or shipping packages received $200 for their efforts.

37.  CD-3 reported that at most, the group would receive two packages at a time and each would go to a different address. No matter the packages, CD-3 arranged a different address for each package.  The group initially used FedEx to receive the packages of drugs from STEWART, but later used USPS.

38.  CD-3 reported he sent packages of U.S. currency to STEWART in California using addresses that STEWART provided him. The amount of U.S. currency per shipment ranged from $20,000 to $130,000.  CD-3 reported the average package contained $50,000, and he sent at least one package per month.

39.  CD-3 reported that on one occasion, he took a trip to California with CD-2, JOHNSON, and a family member of CD-2.  CD-3 reported he had $10,000, and the others all separately carried money on the plane as well.  CD-3 reported he met STEWART on this trip.  When a photograph of STEWART was displayed to CD-3, he stated it looked like the source he met in California.  The purpose of the trip was for CD-2 to pay STEWART.  CD-2 was also hoping STEWART would introduce the group to a new source of supply.  CD-2 wanted a better price or steadier stream of supply and asked STEWART to introduce him to a new source.  Based on this, CD-3 believed STEWART was the intermediary to a "connect" (a higher-level source of controlled substances).

40.   CD-3 said he would communicate with STEWART on his phone, but reported he did not store STEWART as a contact.   CD-3 further stated that the "burner" phone that he had used was thrown away by CD-3 after the December 6, 2017 law enforcement takedown targeting their operation.[8]

41.   CD-3 reported he received a phone call from STEWART after the December 2017 takedown.   STEWART was inquiring about CD-2's arrest and the law enforcement operation in general.

**F.    Information from CD-4**

42.   On October 2, 2018, law enforcement interviewed CD-4.[9] CD-4 said CD-4 has known CD-2 for approximately four years. During the first year, CD-4 observed CD-2 with marijuana, and further reported CD-2 would bring multiple pounds of marijuana to CD-4's apartment.   CD-2 also had shipments of marijuana sent to CD-4's place of employment.

43.   In approximately March 2017, CD-4 learned CD-2 was getting shipments of cocaine.   CD-4 reported the cocaine would be vacuum sealed, wrapped in a balloon and duct taped. Sometimes the cocaine would be inside a book.   CD-2 would use CD-4's apartment to break down the cocaine into smaller amounts

---

[8] I know that a "burner" phone is a temporary phone used by drug traffickers and other criminals to attempt to conceal their identity as the subscriber in order to avoid detection by law enforcement.

[9] CD-4 had no criminal history prior to pleading guilty to federal drug trafficking charges for CD-4's involvement in this conspiracy.  We determined that information provided by CD-4 was credible and corroborated by other investigative information. CD-4 is providing information to law enforcement in the hope of receiving sentencing consideration in CD-4's pending federal case.

(4.5-ounce and 1-ounce quantities) after cutting the cocaine with Inositol.  CD-4 would assist CD-2 and would also help count money.

44.  In approximately October 2017, CD-4 flew to California from Virginia and met CD-2.  CD-2 had contacted CD-4 and instructed CD-4 to fly to California with cash.  CD-4 rolled the cash into jeans and placed the jeans in CD-4's carry-on bag. CD-2 picked up CD-4 at Los Angeles International Airport and they travelled to an apartment building, where CD-2 met with a male and gave him the cash.  CD-4 was shown a photograph of STEWART, and CD-4 believed it was the same person that CD-4 met. CD-4 reported they stayed in the Hawthorne area.

G.  **Evidence of STEWART's Ongoing Drug Trafficking Activity**

1.  Controlled Delivery of Cocaine in the Eastern District of Virginia

45.  On February 9, 2019, members of the Virginia State Police ("VSP") were conducting parcel interdiction at a UPS Facility in Fairfax County, Virginia.  VSP identified a suspicious parcel and a narcotics canine was utilized to scan it, which yielded a positive alert to the presence of the odor of narcotics.  VSP obtained a state search warrant for the parcel in Fairfax County, Virginia.  Located inside the parcel was approximately 1,295 grams of cocaine that was concealed inside a book with a hollowed out center.  The cocaine was vacuumed sealed and taped.  Law enforcement officers directly involved with this investigation field tested the substance inside the parcel, which tested positive for cocaine.

46. Later that day, the VSP, Drug Enforcement Administration, and Homeland Security Investigations conducted a controlled delivery, search warrant and reversal operation of the parcel at an address in Manassas, Virginia. Through their investigation, they learned that a resident of the home was supposed to be paid to receive the parcel and provide it to KENDALL HENRY (the individual who had introduced CD-2 to STEWART). Later, KENDALL HENRY, along with his mother, MAUREEN WISE, and his father, KENNETH HENRY, arrived to pick up the parcel and kilogram of cocaine.

47. During the course of the above investigation, law enforcement reviewed communications on KENDALL HENRY's phone. There were communications related to two parcels shipped from California to the same Manassas residence. There was also a conversation between KENDALL HENRY and his mother (MAUREEN WISE) on or about December 29, 2018. WISE texted and said, "On my way to airport." KENDALL HENRY replied to his mother, WISE, and said, "For what?" She replied, "LA." KENDALL HENRY then texted her, "Didn't you say you coming back Tuesday?" She replied, "I'm going to see Chad" (STEWART's first name). Law enforcement believes that the conversation was in reference to KENDALL HENRY's mother, WISE, flying to Los Angeles, California to visit STEWART regarding the trafficking and distribution of controlled substances.

48. Law enforcement subsequently obtained toll records for WISE's telephone. Those records showed that WISE's telephone was frequently in contact with telephone number (323) 636-1670

20

("STEWART Tel. Number 4"). A review of open source databases conducted on April 11, 2019 and May 9, 2019 showed that STEWART was associated with STEWART Tel. Number 4.

49. Agents then reviewed toll records associated with STEWART Tel. Number 4. Those records indicated that STEWART Tel. Number 4 is engaged in ongoing communication with KENNYDE HENRY (daughter of KENNETH HENRY and MAUREEN WISE), KENNETH HENRY, MAUREEN WISE (mother of KENDALL HENRY and KENNYDE HENRY), and other telephone numbers suspected of belonging to drug traffickers. STEWART Tel. Number 4 was in contact with KENNETH HENRY as recently as April 5, 2019.

> 2. Additional Toll Analysis

50. Additionally, DEA agents identified three telephone numbers associated with ongoing drug trafficking investigations that are also in contact with STEWART, and with KENDALL HENRY, KENNETH HENRY, KENNYDE HENRY, and/or MAUREEN WISE. Based on my training and experience, and my knowledge that STEWART, KENDALL HENRY, KENNETH HENRY, and MAUREEN WISE are all engaged in drug trafficking activity, I believe these three telephone numbers belong to individuals that are conspiring to distribute controlled substances with STEWART, KENDALL HENRY, KENNETH HENRY, MAUREEN WISE, and others:

a. The telephone number (951) 363-0163 was in contact with STEWART and KENDALL HENRY twice on April 15, 2019.

b. The telephone number (714) 803-4807 was in contact with STEWART and MAUREEN WISE on December 26, 2018.

c.   The telephone number (562) 618-1800 was in contact with STEWART, KENDALL HENRY, and/or MAUREEN WISE 263 times between February 27, 2019 and March 28, 2019.  The most recent communication between telephone number (562) 618-1800 and STEWART occurred on May 9, 2019.

**H.   Evidence of STEWART's Association with the Residences and Vehicle to Be Searched**

51.   I reviewed analysis of cell site location data obtained for STEWART Tel. Number 1 and STEWART Tel. Number 2 for the period July 25, 2018 and September 20, 2018 between the hours of 3:00 a.m. and 5:00 a.m. (a time of day when the telephone user is likely sleeping at his or her residence).  The data showed that both telephone numbers were frequently in the vicinity of SUBJECT PREMISES 1 and SUBJECT PREMISES 2 during those hours.

52.   On or around October 9, 2018, law enforcement agents conducted surveillance at SUBJECT PREMISES 1.  During surveillance, law enforcement observed STEWART sitting at the rear of the apartment building that includes SUBJECT PREMISES 1. Observations made during surveillance also determined that STEWART was also associated with an Infiniti M35.  Subsequent investigation into California Department of Motor Vehicle records determined that the Infiniti was registered to STEWART, using the address of SUBJECT PREMISES 1.[10]

---

[10] CD-2 was able to identify several photographs of the apartment building that includes SUBJECT PREMISES 1 as the location of STEWART's residence in California. He also positively identified the Infiniti M35 as belonging to STEWART.

53.   On or about April 24, 2019, law enforcement agents observed a black 2018 Jeep Grand Cherokee (the SUBJECT VEHICLE) parked in the same location at SUBJECT PREMISES 1 as the above Infiniti had been parked.[11]  The SUBJECT VEHICLE is registered to STEWART, with an address of 2100 East Katella Avenue, No. 244, Anaheim, California (SUBJECT PREMISES 2).

54.   Based on law enforcement and public database searches conducted on April 24, 2019, SUBJECT PREMISES 1 and SUBJECT PREMISES 2 are associated with STEWART, including based on utility records.

55.   On May 8, 2019, pursuant to a federal warrant, law enforcement began receiving GPS location data for STEWART Tel. Number 4.  The GPS data showed that STEWART Tel. Number 4 was frequently at SUBJECT PREMISES 1 and SUBJECT PREMISES 2 throughout the evening of May 8, 2019 and the morning of May 9, 2019.

56.   The SUBJECT VEHICLE was observed by law enforcement agents at SUBJECT PREMISES 1 on May 9, 2019 at 5:53 a.m., and at SUBJECT PREMISES 2 on May 9, 2019 at 10:53 a.m.

57.   Based on my training and experience, I know it is common for drug traffickers to maintain controlled substances, illicit contraband, and proceeds from their illegal activities at multiple residences to prevent law enforcement and/or robbers from seizing the contraband. It is also common in the existing

---

[11] I subsequently learned that the Infiniti was in a serious accident in February 2019, and a salvage certificate was issued in April 2019 (explaining why it was no longer present at the residence).  The SUBJECT VEHICLE had been leased on June 30, 2018.

investigation for conspirators to utilize multiple residences for the shipping and receiving of packages containing controlled substances and/or bulk currency.

**I.   Relevant Training and Experience**

58.   Based on my training and experience, I know that individuals involved in criminal activities will often communicate with their associates before, during, or after the crime by using cellular telephones and that communication can be made through either verbal conversation, text messages, or third party communication applications.

59.   Based on my training and experience, I also know that information gained through the obtaining of data stored in cellular telephones and other devices such as address books or contact files in an individual's cellular telephone and other devices, as well as the recovery of messages sent or received from that cellular telephone and other devices, and through review of photographs and videos, can lead to identifying accomplices, or witnesses to the crimes committed by the individual.   Individuals also use their cellular devices to set up, track, and coordinate the shipping of packages through various companies.

60.   Based on my training experience, I also know that know that individuals frequently maintain personal records and documents in an electronic format on laptop computers and/or cellular phones to include backups of data from the above described cellular telephones and other devices.

61.  Based on my training and experience, I know that
distributors of controlled substances will utilize vehicles to
move, store and conceal their controlled substances and proceeds
from law enforcement and the theft of others.  These vehicles
may have "traps" or other concealment methods within the vehicle
or attached to the vehicle.  These vehicles may also store
receipts and records from the shipping of controlled substances
or receipt for packages of currency.

62.  Further, based on my training and experience in
executing court-authorized search warrants, I also know that
drug traffickers commonly maintain at their residences and on
their property additional quantities of the illicit drugs being
distributed.  These drugs may be concealed in locations known to
the traffickers to avoid law enforcement detection.  Drug
traffickers also commonly maintain at their residences and on
their property paraphernalia for packaging, processing,
diluting, weighing and distributing controlled substances.

63.  Based on my training and experience in executing
court-authorized search warrants, I also know that drug
traffickers commonly maintain at their residences money ledgers
and other documents, which note the price, quantity, date and/or
times when controlled substances were purchased, possessed,
transferred, distributed, sold or concealed, or when money was
possessed or transferred.

64.  Based on my training, experience, and participation in
narcotic and drug-related investigations, and my knowledge of
this case, I also know that:

a.   It is common for individuals engaged in the distribution of controlled substances to use telephonic communications, both cellular (to include voice and text messages) and hard line, to further their criminal activities by coordinating the distribution of narcotics, illegal proceeds of narcotics trafficking, and other efforts of co-conspirators;

b.   Individuals engaging in the distribution of controlled substances use cellular telephones and cellular telephone technology to communicate and remain in constant contact with customers and the sources of those controlled substances;

c.   Individuals who engage in the distribution of controlled substances use cellular telephones to exchange information with customers and/or source(s) of supply through text messaging and instant messaging in addition to direct telephone conversations.  It is also common for narcotics traffickers to send photographs and videos as exchange of information with customers and/or source(s) of supply; and

d.   Individuals who engage in the distribution of controlled substances frequently maintain information, personal records, photographs, and documents in an electronic format on computers and/or smart phones.

e.   Individuals who engage in the distribution of controlled substances frequently change phone numbers, and change cellular phones, and use fictitious identities to subscribe to these numbers and devices so as to avoid detection from law enforcement.  In the existing investigation, other

search warrants have resulted in numerous inactive phones being recovered in target locations and target vehicles that still contained evidence related to this investigation.

      f.   In my training and experience, it is likely that the SUBJECT PREMISES or SUBJECT VEHICLE will contain at least one cellular phone because of the use of cellular phones in furtherance of the conspiracy to distribute controlled substances described above.  Further, I know that conspirators have used multiple cellular phones and cellular phone numbers to communicate about drug transactions.

65.  After any cellular phones are seized, law enforcement requests permission to search them.  If law enforcement cannot complete the search, then agents will send the phones to a government laboratory or a private company that specializes in data extraction from electronics.

**J.    Training and Experience on Digital Devices**

66.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the

Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

     b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

     c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

     d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures

are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

67.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.  Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

68.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

     a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

     b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

     c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress STEWART's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of STEWART's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

69.   Other than what has been described herein, to my
knowledge, the United States has not attempted to obtain this
data by other means.

## VI. **REQUEST FOR NIGHT SERVICE**

70.   Federal agents will establish surveillance on the
residences of those under investigation (STEWART, KENNETH HENRY,
MAUREEN WISE, KENDALL HENRY, KENNDYE HENRY, and others) on May
14, 2019.  Agents intend to execute warrants for residences on
the East Coast at approximately 6:00 a.m. Eastern Time.  Around
that time, law enforcement also intends to execute a search and
arrest warrant in Redding, California.  Once individuals
associated with those operations are in custody, law enforcement
intends to simultaneously execute warrants associated with
STEWART.  In the event that other operations are completed prior
to 6:00 a.m. Pacific, this warrant requests the ability to serve
at any time of the day or night.  If there is any appreciable
lag between completing other operations and executing search
warrants associated with STEWART, there is a risk that STEWART
may somehow learn of those searches and arrests and either flee,
destroy evidence, or otherwise obstruct justice.  Accordingly, I
request authorization for night service of this warrant.

## VII.  **ITEMS TO BE SEIZED**

71.   Based on the foregoing, I respectfully submit that
there is probable cause to believe that the items listed in
Attachment B, which constitute evidence of violations of 21
U.S.C. §§ 841(a)(1) and 846 (conspiracy to distribute controlled
substances, and distribution and possession with intent to

31

distribute controlled substances), will be found at SUBJECT PREMISE 1, SUBJECT PREMISES 2, and the SUBJECT VEHICLE.

### VIII.   **CONCLUSION**

72. For all the reasons described above, there is probable cause to believe that evidence of violations of 21 U.S.C. §§ 841(a)(1) and 846 (conspiracy to distribute controlled substances, and distribution and possession with intent to distribute controlled substances), as described above and in Attachment B of this affidavit, will be found in a search of the SUBJECT PREMISE 1, SUBJECT PREMISES 2, and the SUBJECT VEHICLE, as further described above and in Attachments A-1, A-2, and A-3.

_____/s/_____
Michael A. Fernald, Special
Agent, ATF

Subscribed to telephonically
this __10__ day of May, 2019.


_____/s/ Autumn D. Spaeth_____
HONORABLE AUTUMN D. SPAETH
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A-1

### PREMISES TO BE SEARCHED

The premises located at 11893 South Truro Avenue, No. 3, Hawthorne, California 90250 ("SUBJECT PREMISES 1"). SUBJECT PREMISES 1 is further described as located within a two-level multiple unit building. The structure has light colored stucco on the second level and brown vertical plank siding on the first level. A brown two-car garage and a covered parking structure are features of the building. The number "11893" is affixed to the building on the right side and above the two car garage. Unit No. 3 is accessed from within the courtyard area inside the structure. Unit No. 3 is found on the first floor, has a white entrance door behind a black metal security door, with the number "3" posted on the door. Photographs are as follows:

 

**ATTACHMENT A-2**

PREMISES TO BE SEARCHED

The premises located at 2100 East Katella Avenue, Unit 244, Anaheim, California 92806 ("SUBJECT PREMISES 2"). SUBJECT PREMISES 2 is an apartment within a multi-level apartment building, with retail space on the first level. The structure has stucco siding that is gray/tan and blue in color. The primary entrance to the building is a glass door which goes into a lobby area. Above the entrance door to the building, the number "2100" is in white. Unit 244 has a dark colored entrance door. The number 244" is affixed to a gray/white placard posted to the left of the unit's entrance door. Photographs are as follows:

  

**ATTACHMENT A-3**

VEHICLE TO BE SEARCHED

2018 Jeep Grand Cherokee, black in color, bearing
California license plate 8EDR110, with Vehicle Identification
Number ("VIN") 1C4RJFCG5JC436617 (the "SUBJECT VEHICLE").  A
photograph of the SUBJECT VEHICLE follows:



**ATTACHMENT B**

ITEMS TO BE SEIZED

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) and/or 846 (distribution and possession with intent to distribute controlled substances, and conspiracy to distribute controlled substances) (the "Subject Offenses"), namely:

a.    Controlled substances, packaging materials, indicia of distribution, records and documents, receipts, notes ledgers and other papers including any computerized or electronic records including cellular telephones, relating to the ordering, purchase or possession of controlled substances;

b.    U.S. currency and other illicit gains from the distribution of controlled substances;

c.    Address and/or telephone books and papers, including computerized or electronic address and/or telephone records reflecting names, addresses and/or telephone numbers;

d.    Books, records, receipts, bank statements, and records, money drafts, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money or other assets including, but not limited to, controlled substances;

e.    Documents and papers evidencing ownership of proceeds from the sale of controlled substances, storage and location of such assets and facilities to safely store and

secure such items, such as safes, to include lock boxes, and strong boxes;

f.    Photographs, in particular, photographs of controlled substances and photographs of individuals possessing controlled substances and photographs showing the association of individuals;

g.    Indicia of occupancy, residence, and/or ownership of the premises described herein, including, but not limited to, utility and telephone bills, cancelled envelopes, and keys;

h.    Cellular phones, computers, and other electronic storage media or digital devices.  Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

i.    With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.    evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security
software designed to detect malicious software;

        iii. evidence of the attachment of other devices;

        iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

        v.   evidence of the times the device was used;

        vi.  passwords, encryption keys, biometric keys,
and other access devices that may be necessary to access the
device;

        vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

        viii.    records of or information about
Internet Protocol addresses used by the device;

        ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The

government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime

was encountered, including how it was immediately apparent contraband or evidence of a crime.

      d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

      f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

      g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

      h.   After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.    During the execution of this search warrant, law enforcement is permitted to: (1) depress STEWART's thumb and/or

fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of STEWART's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## ATTACHMENT A-1

DIGITAL DEVICES TO BE SEARCHED

The digital devices to be searched are a Black Samsung Galaxy J2 smartphone, with IMEI 352475103924435, Black Apple iPhone, model A1660, with IMEI 355311088165685, both of which were seized from the person of CHAD EVERETT STEWART on May 13, 2019 and are currently in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives.

## **ATTACHMENT A-3**

STORAGE LOCKER TO BE SEARCHED

A storage locker within the residential parking area to the apartment complex located at 11893 South Truro Avenue, Hawthorne, California 90250, with double doors, brown in color, a gold padlock, and between areas labeled "10" and "9", as depicted in photographs below:



## **ATTACHMENT A-1**

<u>DIGITAL DEVICES TO BE SEARCHED</u>

The digital devices to be searched are a Black Samsung Galaxy J2 smartphone, with IMEI 352475103924435, Black Apple iPhone, model A1660, with IMEI 355311088165685, both of which were seized from the person of CHAD EVERETT STEWART on May 13, 2019 and are currently in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives.

**ATTACHMENT A-3**

<u>STORAGE LOCKER TO BE SEARCHED</u>

A storage locker within the residential parking area to the apartment complex located at 11893 South Truro Avenue, Hawthorne, California 90250, with double doors, brown in color, a gold padlock, and between areas labeled "10" and "9", as depicted in photographs below:

